UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,                 :

                                         :

        -v-                             :                S1 20 Cr. 681 (JPC)

                                         :

INNA GEKELMAN,                       :                <u>OPINION AND ORDER</u>

                                         :

                     Defendant.         :

                                         :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

On February 26, 2024, this Court sentenced Defendant Inna Gekelman to a term of

imprisonment of four months, followed by a three-year term of supervised release with the first

four months in home incarceration. Gekelman's conviction arose from her important role in a

widespread and massive health care fraud that involved billing Medicaid for home-health and

personal-care services that were not in fact rendered. Because Gekelman began serving her term

of supervised release around late July 2024, her term is scheduled to expire in approximately

thirteen months.[1] With the support of the Probation Department, Gekelman now moves for early

---

[1] The Court imposed a voluntary surrender date for Gekelman of April 26, 2024. Dkt. 531 ("Amended Judgment") at 2. The Government understands from the Bureau of Prisons that, consistent with that voluntary surrender date, Gekelman began serving her period of incarceration on April 26, 2024, and further that Gekelman was released from custody early after three months and four days, on July 30, 2024, as a result of the First Step Act. Dkt. 651 ("Opposition") at 2. If that is correct, her three-year term of supervision should expire on July 29, 2027. *See id.* This also appears to match the view of the Probation Department, as reflected in Transfer of Jurisdiction forms that office completed in early October 2024, requesting that supervised release jurisdiction be transferred to the Eastern District of New York, and in March 2026, for the transfer of jurisdiction back to the Southern District of New York. Dkts. 572 (stating, as "Dates of Supervised Release," "From July 30th, 2024 To July 29th, 2027"), 653 (same). Gekelman's counsel, in his declaration in support of her motion for early termination of supervised release, however, stated that her term will expire on approximately August 26, 2027. Dkt. 649 ("Motion") ¶ 2. But then in his reply declaration filed just over three weeks later, Gekelman's counsel stated that the

termination of her supervised release. The Government opposes her motion. For reasons that follow, the motion is denied.

## I. Background

Gekelman participated in a widespread fraudulent scheme involving massive amounts of false billings to Medicaid for home-health and personal-care services that were not actually rendered. Dkt. 459 ("PSR") ¶ 24. Gekelman's role was that of a paid recruiter of no-show home-care aides and patients for Attentive Home Care, which operated as "Always Home Care." *Id.* ¶ 70. In the course of her criminal activity, Gekelman tried to recruit someone who, unknown to her, was a confidential human source ("CHS") working with the Federal Bureau of Investigation. *Id.* ¶ 71. She explained to the CHS that no-show cases can be lucrative, and walked the CHS through how the scheme worked: "Here is the full picture, in order to have anything you need to have a big case. Otherwise if the case is small, and on top of it you divide 50/50[.] What's left from that case?! Nothing is left. And a lot of hours – that means a very sick person. Very sick person means it's dangerous to leave him alone. Total crap. Ok, what else can there be[?] Nowadays a lot of people go to work for their parents." *Id.* Gekelman further assured the CHS that it was easy to recruit no-show cases because of the high demand for them, and noted that there were many no-show cases in the apartment building where she worked. *Id.* In total, Gekelman was responsible for an intended loss of $1.4 million, which reflects a reasonable estimate of the number of no-show cases known to her and of the losses associated with those cases. *Id.* ¶ 82. Between 2014 and 2017, Gekelman personally received approximately $70,000 for her work with Always Home Care and another agency involved in the fraud. *Id.* ¶ 73.

---

expiration date is July 26, 2027. Dkt. 652 ("Reply") ¶ 2. At this time, the Court does not need to resolve the precise date when Gekelman's supervised release is set to conclude, although it appears to be in late July 2027.

Gekelman, along with many of her co-conspirators, was arrested on December 16, 2020. *Id.* ¶ 84.  On June 26, 2023, she pled guilty, pursuant to a plea agreement with the Government, to one count of wire fraud in violation of 18 U.S.C. § 1343.  *Id.* ¶ 10; Dkt. 442 ("Guilty Plea Tr.").

On February 26, 2024, the Court sentenced Gekelman to four months' imprisonment to be followed by three years of supervised release, with the first four months of supervised release entailing home incarceration.  Dkt. 535 ("Sent. Tr.") at 36:22-37:2; *see* Amended Judgment at 2-5.  The Court also imposed restitution in the amount of $1,400,000, forfeiture in the amount of $17,500, and a special assessment of $100.  Amended Judgment at 6-8; Dkt. 533 ("Order of Restitution"); Dkt. 534 (order of forfeiture); *see* Guilty Plea Tr. at 14:21-16:6 (Gekelman confirming her understanding that her guilty plea required her to pay restitution, forfeiture, and a special assessment).  Gekelman has satisfied her forfeiture and special assessment obligations and has been making monthly payments of $190 towards restitution.  *See* Motion ¶ 7; Dkt. 658 ("5/27/26 Tr.") at 5:16-20.

That sentence was a significant downward variance from the United States Sentencing Guidelines' recommended range of incarceration of 21 to 27 months.  *See* Sent. Tr. at 12:5-17, 28:21-22.[2]  When announcing the sentence, the Court began with a discussion of Gekelman's criminal conduct to assess various factors under 18 U.S.C. § 3553(a), specifically, the nature and

---

[2] The Presentence Investigation Report and parties' plea agreement calculated Gekelman's offense level as 18 and placed her in criminal history category I, yielding a Guidelines range of 27 to 33 months' imprisonment.  Plea Tr. at 18:13-19:15; PSR ¶¶ 11, 93-107, 147; *see* Sent. Tr. at 11:4-8.  Following Gekelman's guilty plea on June 26, 2023, and the issuance of the final Presentence Investigation Report on September 11, 2023, an amendment to the United States Sentence Guidelines went into effect at U.S.S.G. § 4C1.1.  That new provision entitled Gekelman to an additional two-point reduction in her offense level as a so-called "zero-point offender."  Sent. Tr. at 11:9-20, 12:10-11; *see* U.S.S.G. § 4C1.1.  With that reduction, Gekelman's offense level was 16 and her Guidelines range was 21 to 27 months' imprisonment.  Sent. Tr. at 12:5-17, 28:21-22.

circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, and the need to provide just punishment. *Id.* at 29:22-30:2. The Court explained that Gekelman "was involved in a sophisticated multi-year criminal scheme, one that involved many millions of dollars of false billing for health care services that were not, in fact, rendered." *Id.* at 30:5-8. The Court emphasized Gekelman's important role in the fraud as a paid recruiter of no-show aides and no-show patients, as well as a facilitator of kickback payments to no-show patients. *Id.* at 31:15-32:14. To avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, the Court compared Gekelman's role to those of other participants in the scheme who had been sentenced, acknowledging that Gekelman had a less significant role than several of her co-conspirators. *Id.* at 30:2-4, 32:15-33:19. The Court also examined Gekelman's history and characteristics, pointing to her advanced age, medical conditions, role as a caretaker for her son, remorse, compliance with pre-sentencing supervision, and lack of prior criminal convictions, as well as the deleterious impact on her son of a period of incarceration. *Id.* at 33:20-35:22. In light of Gekelman's age, lack of criminal history, and remorse, the Court did not assess there to be "a significant danger of recidivism," and therefore did not see "a strong need for individual deterrence or to protect society from future crimes by her." *Id.* at 35:18-22. The Court stressed, however, the need for general deterrence given the high risk of fraud in the home healthcare industry, the calculated and deliberate nature of this sort of criminal conduct, and the resulting harm to the public fisc. *Id.* at 35:23-36:7.

According to the Government, Gekelman began her term of incarceration on April 26, 2024, was released early after three months and four days under the First Step Act, and has since been on supervised release. *See* Opposition at 2 (relaying information from the Bureau of Prisons); *see also* Amended Judgment at 2 (setting a voluntary surrender date of April 26, 2024). Gekelman

4

currently is subject to "low intensity" supervision by the Probation Department, which is the lowest level of supervision and entails monthly virtual check-ins and requires obtaining authorization from the Probation officer to travel outside the District. *See* 5/27/26 Tr. at 10:17-11:10; Opposition at 3 & n.1 ("The Government understands that supervisees in low intensity cases are merely required to check in virtually with the Probation Office once per month."); Reply ¶ 7 (acknowledging that Gekelman must "participat[e] in a brief monthly virtual check-in").

On February 17, 2026, approximately midway through her three-year term of supervised release, Gekelman moved for early termination, attaching several letters and documents in support of her motion. Dkt. 649.[3] Gekelman contends that early termination is warranted because she "has been a model probationer" with no violations of her conditions of release, performs community service and volunteer work, *id.* ¶¶ 7-8, 13-18, and needs to help care for her daughter in Florida, *id.* ¶ 19. The Government opposed the motion on March 4, 2026, Dkt. 651, and Gekelman replied on March 11, 2026, Dkt. 652. On May 21, 2026, Gekelman filed a supplemental letter informing the Court that she was injured after being struck by a scooter while walking on a sidewalk in Brooklyn. Deft. Supp. Ltr. at 1. On May 27, 2026, the Court held a conference on Gekelman's motion, including to explore whether the parties would be amenable to any

---

[3] In moving for early termination, Gekelman invokes 18 U.S.C. § 3564(c). Motion ¶¶ 2, 9. That is the wrong authority for the relief she seeks. Section 3564(c) governs the early termination of probation and directs a court to consider all of the "the factors set forth in section 3553(a) to the extent that they are applicable" before "terminat[ing] a term of probation." 18 U.S.C. § 3564(c). Gekelman, however, is serving a term of supervised release, not probation. Title 18, United States Code, Section 3583(e)(1) governs motions for early termination of supervised release. *See* 18 U.S.C. § 3583(e)(1) (providing that a court may "terminate a term of supervised release" after considering certain enumerated subsections of Section 3553(a)). The Court thus construes Gekelman's motion as one under Section 3583(e)(1), which is the provision correctly cited in her supplemental letter of May 21, 2026, Dkt. 657 ("Deft. Supp. Ltr.") at 2.

modification of supervised release to address Gekelman's contention that the current conditions are too burdensome.  *See generally* 5/27/26 Tr.[4]

## II.  Discussion

Pursuant to 18 U.S.C. § 3583(e)(1), "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)," the Court may "terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice."  18 U.S.C. § 3583(e)(1).  But "early termination is not . . . warranted as a matter of course."  *United States v. Rosario*, No. 17 Cr. 27 (LTS), 2023 WL 7305260, at *2 (S.D.N.Y. Nov. 6, 2023) (citation modified).  A district judge may terminate a defendant's supervised release early if "changed circumstances" such as "exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release . . . render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals" set out in 18 U.S.C. § 3553(a).  *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997).  Even so, "new or changed circumstances relating to the defendant" are not necessarily required to modify conditions of supervised release, "[s]o long as the court, when modifying supervised

---

[4] At the May 27 conference, the Court inquired whether, in lieu of the Court resolving the early termination request, the parties would be amenable to a modification of Standard Condition 3 of Gekelman's supervised release that would allow "her to travel to and from Florida and points in between without needing permission from the [P]robation [D]epartment in advance, but instead only to notify [P]robation when she decides to travel [and provide] a flight itinerary that they can note in their file."  5/27/26 Tr. at 8:1-7; *see* Amended Judgment at 4 ("You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.").  Gekelman advised that she was not interested in such a modification to her supervised release, and only wanted her supervised release terminated.  5/27/26 Tr. at 12:19-13:5.

release conditions, considers the relevant 18 U.S.C. § 3553(a) sentencing factors." *United States v. Parisi*, 821 F.3d 343, 347 (2d Cir. 2016) (per curiam) (collecting cases).

The Court declines to terminate Gekelman's supervised release. In arguing for early termination, Gekelman cites her compliance with the conditions of her release combined with her "longstanding good character, rehabilitation, community service, and the significant personal hardship she is currently facing," including caregiving responsibilities for her daughter and a recent personal injury. Motion ¶¶ 13, 15; *see* Deft. Supp. Ltr. at 1. While the Court is pleased that Gekelman has complied with the conditions of her supervised release, including by making payments toward her court-ordered financial obligations, and appears to have been a productive member of society since completing her period of incarceration, including by regularly volunteering, *see* Motion ¶¶ 12, 14, compliance is expected of one under supervision. *See United States v. Wheeler*, No. 20 Cr. 492 (GHW), 2023 WL 4561591, at *1 (S.D.N.Y. July 17, 2023) ("Full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release and does not warrant early termination." (citation modified)); *accord, e.g.*, *United States v. Scarpa*, No. 18 Cr. 123 (CBA), 2024 WL 1886681, at *1 (E.D.N.Y. Apr. 30, 2024); *Rosario*, 2023 WL 7305260, at *3; *United States v. Auerbach*, No. 19 Cr. 607 (PKC), 2023 WL 4600065, at *1 (E.D.N.Y. July 18, 2023). "Compliance with release conditions does not, by itself, provide a basis for early termination of supervised release." *United States v. Guerrero-Fajardo*, No. 23 Cr. 210 (JPC), 2024 WL 3925338, at *2 (S.D.N.Y. Aug. 23, 2024).

Neither do the medical needs of Gekelman's daughter and Gekelman's recent injury render supervision unduly harsh. *See Lussier*, 104 F.3d at 36. Gekelman has not suggested that her physical "conditions are exacerbated by [her] supervised release." *United States v. Pena*, No. 08

Cr. 578 (JGK), 2022 WL 2733871, at *1 (S.D.N.Y. Jun. 27, 2022).  And she remains at the lowest level of supervision by the Probation Department, subject to only brief monthly virtual check-ins and the modest requirement that she receive permission from her Probation officer prior to traveling out of the District.  5/27/26 Tr. at 10:17-11:10; Opposition at 3 & n.1; Reply ¶ 7; Amended Judgment at 4.  Gekelman's insistence that these light requirements cause her "stress" that "would further burden her ability to assist during [her daughter's] medical crisis," Motion ¶ 15; *accord* Reply ¶ 7—particularly where Gekelman has requested authorization to travel only on three occasions, and each time it was quickly approved, 5/27/26 Tr. at 8:13-17, 11:12-12:5—is just not convincing.  Nor is the Court persuaded that Gekelman's purported "fear" that "her age, memory problems, medical condition, or urgent family caregiving responsibilities will cause her to unintentionally violate supervision," Deft. Supp. Ltr. at 3, warrant removing these minimally burdensome reporting and notification obligations.  Indeed, the veracity of Gekelman's contention that seeking travel authorization imposes such a significant burden on her is belied by her decision not to request that Standard Condition 3 be modified to require only notification of upcoming travel to her Probation officer.  5/27/26 Tr. at 12:18-13:2; *see supra* n. 4.

Furthermore, when at sentencing the Court imposed a substantially below-Guidelines sentence for Gekelman, the Court expressly considered her role as a caregiver (then, with respect to her son) and a parent, her age, and her overall health.  Sent. Tr. at 34:9-19, 35:9-11, 36:8-11.  While the Court sympathizes with the demands on Gekelman to support her daughter, as well as the difficulties created by her recent injury, Gekelman has failed to show that these changes to her circumstances burden her ability to comply with the conditions of supervised release such that the conditions have become unduly harsh or inappropriately tailored to the relevant considerations under Section 3553(a).

And to be sure, several of those relevant Section 3553(a) factors—specifically, the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need for adequate deterrence, *id.* § 3553(a)(2)(B), the need to protect the public from further crimes of the defendant, *id.* § 3553(a)(2)(C), and the need to provide restitution to the victim of the offense, *id.* § 3553(a)(7)—weigh against early termination. Gekelman committed a serious crime by participating in a sophisticated scheme to defraud Medicaid, a critical public resource that supports low-income individuals in meeting their healthcare needs. *See* PSR at 30-31. The no-show aides and no-show patients that Gekelman recruited were crucial to the scheme's success, as the crime entailed billing Medicaid for "home-health or personal-care services that were not actually rendered." *Id.* ¶¶ 30, 70.

This was not just very serious conduct, but it also is conduct that Gekelman could still commit today, notwithstanding her age and health issues. While at sentencing, the Court noted that this case did not present a "strong need for individual deterrence or to protect society from future crimes by her," Sent. Tr. at 35:20-22, those Section 3553(a) considerations are not completely absent for Gekelman. Gekelman recruited no-show aides and no-show patients while she worked as a social worker at the Jewish Community Council of Canarsie. PSR ¶¶ 71, 137. Gekelman currently appears to work in a very similar role for the Metropolitan Russian American Parents Association. Motion ¶ 14, Exh. 4 at 4. Continued supervision by the Probation Department will serve the important purpose of helping ensure that Gekelman continues to follow the law, while at the same time placing but a minimal burden on her through light reporting and travel-authorization obligations.

This interest in ensuring that Gekelman does not return to illegal activity is enhanced by troubling comments she made at her sentencing, when she minimized her role and indicated a

9

failure to fully appreciate the seriousness of her criminal conduct.  When given the opportunity to speak at sentencing, Gekelman suggested that she had only participated in one no-show case, that she was provoked to do so by the CHS, and that she tried to talk the CHS out of engaging in criminal conduct.  Sent. Tr. at 19:15-20:21 ("I did all my best to talk [the CHS] from this idea"; "But my sincere offer to help [the CHS find a job] was categorically rejected"; "I really blame myself for the fact that knowing about illegal actions of [the CHS], I compromised with my principles and did not report to the authorities about his criminal activities"; "this huge mistake that I did one time in my life").  Appreciating how problematic this statement was, as it was sharply contradicted by the Government's proof and suggested that his client was not accepting responsibility, Gekelman's counsel immediately requested that she be allowed to retract it, *id.* at 26:4-13, a request that Gekelman herself soon joined, *id.* at 27:11-19.  Her statement remains troubling nonetheless.

In addition, Gekelman still owes more than $1 million in restitution.  *See* Motion ¶ 7; Order of Restitution; 18 U.S.C. § 3553(a)(7); *see also* 5/27/26 Tr. at 5:4-8.  Supervision "continues to be necessary to ensure that . . . [Gekelman] fulfills [her] restitution obligations."  *United States v. Lagone*, No. 10 Cr. 818 (JFB), 2017 WL 606016, at *4 (E.D.N.Y. Feb. 15, 2017); *see United States v. Elefant*, No. 21 Cr. 530 (SHS), 2026 WL 35256, at *2 (S.D.N.Y. Jan. 6, 2026) (finding that "continued supervision is appropriate considering, for example, [the defendant's] . . . restitution obligations").  Two special conditions of Gekelman's supervised release are geared at ensuring she continues to meet her financial obligations: Gekelman "must not incur new credit charges or open additional lines of credit without the approval of the Probation Officer unless [Gekelman] is in compliance with the installment payment schedule" and she "must provide the Probation Officer with access to any requested financial information."  Amended Judgment at 5.  And there is no

10

indication that early termination would in any way improve Gekelman's ability to fulfill those restitution obligations. *Cf. United States v. Boyd*, No. 13 Cr. 890 (LAP), 2025 WL 1865164, at *3 (S.D.N.Y. July 7, 2025) (granting a motion for early termination in part because an "effect of Defendant's supervised release [was] to frustrate his potential promotion and his ability to continue to pay restitution").

To be sure, the factors recently set out by the United States Sentencing Commission in Application Note 1(B) to U.S.S.G. § 5D1.4 generally weigh in Gekelman's favor, as the Government concedes, Opposition at 4 n.2. Application Note 1(B) provides that "the court may wish to consider" the following factors "[w]hen determining whether to terminate the remaining term of supervised release":

(i)     any history of court-reported violations over the term of supervision;

(ii)    the ability of the defendant to lawfully self-manage . . .;

(iii)   the defendant's substantial compliance with all conditions of supervision;

(iv)    the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;

(v)     a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision;

(vi)    and whether termination will jeopardize public safety . . . .

U.S.S.G § 5D1.4, cmt. n.1(B). This Application Note, however, does not "alter[] the legal standard for granting a motion for early termination," especially given that the policy statement itself "merely restates the court's authority under 18 U.S.C. § 3583(e)(1) to terminate the remaining term of supervision if the court determines that early termination is 'warranted by the conduct of the defendant and in the interest of justice.'" *United States v. Tirado*, No. 15 Cr. 487 (GBD), 2026 WL 1088721, at *2 n.2 (S.D.N.Y. Apr. 22, 2026) (quoting U.S.S.G. § 5D1.4(b)); *accord United*

11

*States v. Kaplan*, No. 23 Cr. 320 (GHW), 2026 WL 1801190, at *2 (S.D.N.Y. June 22, 2026); *United States v. Parkins*, No. 25 Cr. 273 (PMH), 2026 WL 1662170, at *4 n.8 (S.D.N.Y. June 9, 2026); *compare* U.S.S.G. § 5D1.4(b), *with* 18 U.S.C. § 3583(e)(1).   The standard for early termination is set by federal statute at 18 U.S.C. § 3583(e)(1), and, as discussed, requires a court to be satisfied that early termination "is warranted by the conduct of the defendant released and the interest of justice" and entails "considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)."   That standard is what the Court considered above in concluding that early termination of Gekelman's supervised release is not warranted.

Thus, notwithstanding Gekelman's compliance thus far with the terms of her supervised release, as well as the changes to her caregiver role and her heath, the imposed term of supervised release properly reflects the nature and circumstances of her offense, accounts for her history and characteristics, achieves adequate deterrence, protects society from future crimes, and helps ensure that restitution will continue to be paid.   Gekelman's request for early termination of her supervised release therefore is denied.

### III.  Conclusion

Accordingly, the Court declines to terminate Defendant Inna Gekelman's period of supervised release.   This denial is without prejudice to Gekelman, the Government, or the Probation Department making another application for early termination in the future if appropriate.

SO ORDERED.

Dated: June 26, 2026
        New York, New York                                          _____
                                                                                    JOHN P. CRONAN
                                                                         United States District Judge

12